Filed 8/19/21  In re L.B. CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re L.B., a Person Coming Under the Juvenile Court Law. | D078738 |
| SAN DIEGO COUNTY HEALTH AND SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J520579) |
| v. | |
| V.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Rohanee Zapanta, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

V.S. (Mother) appeals a dispositional order entered in a juvenile dependency proceeding removing her infant son, L.B., from her custody

pursuant to Welfare and Institutions Code[1] section 361, subdivision (c)(1). The San Diego County Health and Human Services Agency (the Agency) initiated the dependency proceeding following L.B.'s hospitalization after N.B. (Father)[2] strangled him. On appeal, Mother contends substantial evidence does not support the juvenile court's dispositional findings. She also claims the court erred by failing to consider less drastic alternatives when it ordered that L.B. be removed from her care. We reject these challenges and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The November 9, 2020 Incident*

    1. *Mother Witnesses Father Strangling L.B.*

On November 9, 2020, L.B. was napping on the bed in his parents' bedroom. He was three months old at the time. L.B. began to cry, and Father went into the bedroom to check on him. When the baby continued to cry, Mother also went into the bedroom where she witnessed Father with his hands wrapped around L.B.'s neck "dangling" him over the bed and shaking him back and forth. L.B.'s face was red, and he was no longer crying since he could not breathe. Mother immediately confronted Father, who "dropped" L.B. on the bed "roughly."

Mother picked up L.B., yelled at Father, and locked herself in the bathroom where she called the paternal grandmother and the maternal grandmother (MGM). When no one answered, Mother exited the bathroom with L.B. and told Father that he would never see his son again. Father then

_____

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    Father is not a party to this appeal.

went into the kitchen, grabbed a knife, and threatened to kill himself. While holding L.B., Mother tried to get the knife out of Father's hands. The parents began pushing one another, and Mother struck Father with her fists. Shortly thereafter, Father left the home and went to a hospital where he checked himself in for suicidal ideation.

Eventually, the MGM came to the house and had to actively encourage Mother to call the police. Initially reluctant to do so, Mother finally called the nonemergency police line over an hour after the strangling incident. She obtained an emergency protective order against Father that evening.

2. *L.B.'s Medical Evaluation*

After the police arrived, L.B. was transported to Rady Children's Hospital. An examination revealed scattered petechiae on the anterior and right side of L.B.'s neck. There was also a "[y]ellow/green amorphous bruise" on the right side of his neck below the jaw with a healing laceration overlying it. In addition, L.B. presented with a healing fractures to his right wrist.

Mother informed Dr. Sarah Vega, a child abuse pediatrician, that three days before the strangling incident she left L.B. with Father for a few hours. While she was gone, Father texted her that L.B. was fussy and crying. When Mother returned home, Father pointed out marks on L.B.'s neck that he claimed were self-inflicted. Mother believed Father at the time and did not have L.B. evaluated. Several days before that Mother noticed that L.B.'s right forearm was swollen, but she likewise did not have that injury evaluated. No explanation was provided as to the cause of the wrist fractures. Mother also recounted several incidents of abuse perpetrated by Father against her.

3

3. *Child Abuse Pediatrics Inpatient Consultation*

After examining L.B. and interviewing Mother and the MGM, Dr. Vega opined in a child abuse pediatrics inpatient consultation report that the November 9 incident was "a near fatality." She noted that the healing laceration on L.B.'s right jaw and the healing fractures on the right wrist were indicative of inflicted trauma from at least two separate abuse events. Vega expressed concern about Mother's "protective capacity" or lack thereof. This was based on Mother's failure to seek immediate medical attention for L.B. after witnessing him being violently shaken and strangled. Mother also did not want to involve law enforcement until encouraged to do so by the MGM. Vega opined that either Mother did not realize the severity of the strangling incident, or she was more concerned about her relationship with Father. Additionally, Mother placed herself and L.B. in front of Father while he was wielding a knife, demonstrating "a serious lapse in judgment." Lastly, Mother expressed a willingness to reunite with Father after he seeks help. According to Vega, "It is not uncommon for women who are engaged in domestic violence relationships to repeatedly return to these same relationships or ones similar to them. It will be imperative for mother to recognize these unhealthy patterns and to show an ongoing willingness to refrain from them in order to ensure the health and safety of her child."

4. *Child Abuse Pediatrics Medical Evaluation*

On November 24, 2020, Dr. Vega followed up her initial consultation with a medical evaluation of L.B. Vega remained concerned about the healing lacerations on L.B.'s neck, which suggested two separate strangling incidents. She also highlighted that there was no explanation for the healing fractures in the wrist, which were also indicative of inflicted injuries and would have occurred at a different time than either of the strangling

4

incidents. Vega wrote that "[i]f [L.B.] were to be returned to the environment in which his injuries were sustained without identification of and removal of the perpetrator it would place him at extreme risk of further maltreatment and potentially death."

B. *Father's History of Violence*

Mother and Father had been in a relationship for three years by the time of the November 9 strangling incident. Mother told the social workers that Father began abusing her seven months into the relationship. Once, he punched in Mother's radio and pushed Mother up against the wall while holding her by the throat. On another occasion, he held Mother down on the bed and pretended to grab her neck because he knew she was scared of being choked. Father also yelled at Mother and threw water in her face.

The violence continued when Mother was pregnant with L.B. Father once held Mother down on the bed and, at a separate time, strangled her. On yet another occasion, Father and Mother were involved in an altercation when Father pushed Mother, causing her to fall down some steps. He then put his hands above her neck in a strangling fashion, though he did not actually touch her. At another point, Father kicked Mother in the stomach. Mother went to a medical appointment the day after the kicking incident but did not tell the doctor what had happened because she "was scared to talk to anyone about what had been going on." The physical aggression stopped when Mother was five months pregnant. When asked how she and Father

5

handled disagreements, Mother said, " 'after I was five months pregnant[,] we just wouldn't talk about it.' "[3]

## C. *L.B.'s Dependency Proceedings*

### 1. *The Dependency Petition*

The Agency filed a dependency petition on behalf of L.B. pursuant to section 300, subdivision (a), for physical abuse of a child by a parent and pursuant to subdivision (e) for severe physical abuse by a parent. Specifically, it was alleged as to count 1 that "[o]n or about November 9, 2020, the child's parents subjected the child to the substantial risk of serious physical harm, including but not limited to, physical abuse and damage, to wit: The parents engaged in a violent altercation while the mother was holding the child and the father threatened to commit suicide while holding a knife. Thereafter, the father was hospitalized for suicidal ideation. Accordingly, there is a substantial risk the child will suffer serious physical harm, inflicted non-accidentally." It was alleged as to count 2 that "[o]n or about November 9, 2020, the child, who was under the age of five years, suffered severe physical abuse, inflicted by the father, wherein the father shook and strangled the child. As a result, the child stopped crying and breathing. Thereafter, the child was found to have a healing laceration to the anterior neck, scattered petechiae over the anterior and right side of the neck, a bruise on the right side of the jaw, and healing fractures to the right radius and ulna. Accordingly, the child is in need of the protection of the [j]uvenile [c]ourt."

---

[3] Mother also described two incidents of animal abuse involving the family dog, Mac. During the first incident, Father threw his hat at the dog, and the brim audibly hit Mac in the face. The second time, Father threw a metal leash with a clip on it at Mac, causing the dog to whimper.

The Agency recommended that L.B. be removed from both parents' custody because of physical abuse and failure to protect. At the detention hearing held on November 18, 2020, the juvenile court found that there had been a prima facie showing made as to both subdivisions of section 300. L.B. was detained and placed with the MGM, and Mother was granted limited supervised visits.

2. *The Jurisdiction and Disposition Hearing*

In its jurisdiction and disposition report, the Agency's assessment was that L.B. could suffer further physical injury, emotional harm, neglect, or death if he were to remain in his parents' custody. This was based on several factors, including the seriousness of the strangling incident, the parents' involvement in a domestic violent incident while Mother was holding L.B. and Father was wielding a knife, L.B.'s unexplained healing wrist fractures, and Mother's lack of judgment in not seeking immediate medical attention. By then, Mother had acknowledged to a social worker that she showed "a lack of judgment" when she placed L.B. and herself in front of Father. She said her "biggest mistake of all is not calling the police because [L.B.] could have injuries that were not visible." She explained that she "was just in crisis mode, it was hard to think straight."

At the jurisdictional and dispositional hearing held on December 14, 2020, the juvenile court recognized the steps that Mother had taken thus far, to include acknowledging her own behavior that placed L.B. in danger. In light of these steps, the court authorized the MGM to supervise Mother's visits with L.B. and set a contested hearing for February 24, 2021.

3. *The Agency's Addendum Reports*

In an addendum filed on February 8, 2021, the Agency outlined Mother's progress with her services but reiterated its concern about placing

L.B. in her care, believing it would be "premature" because she had only recently begun engaging in the services. The Agency remained hopeful, though, that "as [Mother] engages in services over time, she will develop the insight and understanding of the protective issue that brought [L.B.] into the Agency's care and will be able to protect [L.B.] in the future." In another addendum filed on February 24, 2021, the Agency provided an update on Mother's progress with her services but continued to recommend that L.B. remain with the MGM.

### 4. *The Contested Adjudication and Disposition Hearing*

#### a. *Mother's Testimony*

At the February 24, 2021 contested hearing, Mother testified as to her progress with her services.[4] At the time, she had attended two child abuse classes, which helped her realize that she failed to protect L.B. on the day of the strangling incident by engaging in a violent altercation with Father instead of seeking medical care for L.B. or calling the police right away. Mother expressed remorse that she remained with Father despite his abuse. She also testified that she had attended five or six domestic violence classes, learning about the effects of domestic violence on young children, the cycle of domestic violence, and how to identify red flags. The most recent domestic violence class focused on power and control, but Mother admitted that she "ha[d] more to learn on that" because she had not yet finished the week's homework assignment. Lastly, she testified that of the approximately eight parenting classes that she had attended thus far, half were intake and

---

[4] As Father is not a party to this appeal, we limit our summary of the contested hearing to the testimony of Mother and the social worker, as well as the juvenile court's findings and orders as they relate to Mother.

introductions, and the remainder focused on identifying whether a child is sick or injured and when to seek medical help.

Regarding the strangling incident, Mother explained that "it never came to [her] head" to call the police and that she "was just in a panic mode." After she was unable to contact the paternal grandmother or the MGM by phone, she became "frantic" and "angry," leading her to engage in a violent altercation with Father. Only when Father left the home was Mother able to "calm down" and realize that L.B. could be seriously hurt. She was concerned about involving the police and Child Protective Services, but she discussed it with the MGM and contacted the nonemergency police line "no more than two hours" after the incident. Mother admitted that she had never told anyone about Father's abusive behavior in the past.

Mother next testified as to the prior incidents of suspected abuse of L.B. Regarding the marks visible on L.B.'s neck after he was left in Father's care, Mother testified she believed Father's explanation that L.B. hurt himself since L.B. had previously nicked his face. Mother was also aware of L.B.'s swollen right wrist and made a mental note to discuss it at the next doctor's appointment scheduled for two weeks later, but the swelling went away the next day. At the time of both of these incidents, Mother did not think Father could have inflicted the injuries. It was not until she witnessed Father strangling L.B. that Mother "put two and two together." She testified that her first priority now is to protect L.B. from harm. Mother acknowledged, however, that it was "naive" of her to believe that Father would not hurt L.B. considering his history of violence against her and their dog.

b. *The Social Worker's Testimony*

The social worker testified that Mother had four-hour daily visits with L.B. on weekdays supervised by the MGM. She admitted she had not made any unannounced visits during Mother's visitation time because she had "not had a reason to do that thus far." She believed the visits were "going well and that [L.B.] is safe during those visits at this time."

Nonetheless, the social worker believed it would be "premature" to give Mother custody, believing she needed to engage in services "over a longer period of time." According to the social worker, Mother's level of insight was "consistent with where she is at with her treatment," and she is "starting to learn about her responsibility to protect [L.B.] and some of the domestic violence dynamics that she was experiencing." She thought Mother's testimony was too focused on her relationship with Father instead of what specifically happened with L.B., but she expressed confidence "that eventually the mother may get there with services, and she is very motivated." As for Mother's insight into domestic violence, the social worker testified that "her level of insight is definitely a good start for the sessions she has completed. I think that with more time and more participation in services, it will improve."

The social worker was concerned that Mother had shown a "consistent pattern" of lack of judgment, to include failing to seek medical care for L.B.'s swollen wrist and failing to inform a doctor that Father kicked her in the stomach while she was pregnant with L.B. She also thought it would be "not appropriate" for Mother to live with MGM because of the "unrealistic expectation" that MGM would watch Mother all day.

10

### c. *The Juvenile Court's Findings*

The juvenile court found by clear and convincing evidence that the allegations of the petition were true. As to jurisdiction, the court found that Mother failed to seek timely medical treatment for L.B. after the strangling incident and that there was no explanation for L.B.'s wrist fractures. As to disposition, it denied Mother's request for placement. Even though the court found Mother's testimony "honest and credible," it determined that Mother still needed time—"there is just the shear [*sic*] amount of time"—to continue to engage in services and gain the tools, skills, and understanding to move forward while maintaining a parenting relationship with Father and the paternal grandparents. The court found that Mother was "making progress with her services," but she was "just starting." It also referenced Mother's testimony about cheating in the relationship, which seemed to indicate that Mother was still at the height of her emotions and lacked insight into the nature of the domestic violence relationship. The court did, however, order structured, unsupervised visitation for Mother in light of her active participation in services and her ability to identify L.B.'s needs. It then declared L.B. a dependent and found by clear and convincing evidence that his removal was appropriate pursuant to section 361, subdivision (c)(1).

## DISCUSSION

On appeal, Mother contends the juvenile court erred by removing L.B. from her custody.[5] She argues the evidence does not support a finding of substantial danger to L.B. if he were returned to her. She asserts there was no evidence that she caused any physical injury to L.B., and her successful

---

[5]  Mother does not challenge the juvenile court's jurisdictional findings.

participation in services warranted L.B.'s placement with her.  Mother also claims there were reasonable alternatives to removal.

A. *Relevant Legal Principles and Standard of Review*

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing.  [Citation.]  At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)  " 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.' " (*Id.* at pp. 169–170.)  At the dispositional stage, the court may consider a parent's past conduct, present circumstances, and response to the conditions giving rise to the dependency proceedings.  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*).)

To support an order removing a child from parental custody, the juvenile court must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . ." (§ 361, subd. (c)(1).)  The court must also determine "whether reasonable efforts were made to prevent or eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)  "The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)

12

The standard of review for a dispositional order is substantial evidence. (*Cole C.*, *supra*, 174 Cal.App.4th at p. 916.) "Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. We draw all legitimate and reasonable inferences in support of the judgment. The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders. [Citation.]" (*In re D.B.* (2018) 26 Cal.App.5th 320, 328–329.)

B. *Substantial Evidence Supports the Juvenile Court's Dispositional Findings*

Mother argues there was insufficient evidence that L.B. was at risk if placed with her. She asserts there were no concerns about L.B.'s safety during the supervised visits and there was no evidence that she had ever harmed L.B. in the past. She further argues that she has been actively engaged in services, she is progressing in her case plan, and she already has liberal, unmonitored visitation with L.B.

Pursuant to section 361, subdivision (c)(1), the juvenile court was tasked with determining whether "[t]here is or would be a substantial danger" to L.B. if he was returned to Mother's custody. The court found by clear and convincing evidence that such danger existed based on Mother's limited progress in services and the potential for future interactions with Father. Although it was complimentary of Mother's progress, it determined that "there is just the shear [*sic*] amount of time" needed for her to gain insight into domestic violence and to apply the tools necessary to successfully coparent with Father.

While a court's bare desire for more time may be an insufficient basis to support a finding of "substantial danger," we conclude there was substantial evidence here to support the court's dispositional order. As an initial matter,

13

the record before the court highlighted the seriousness of the November 9 incident. Mother does not dispute that L.B. was lifted by his neck, strangled, and shaken until he was unable to breath. Dr. Vega explained that "[s]trangulation is a highly lethal event that can lead to lack of oxygen to the brain, loss of consciousness, seizures, coma or death. Similarly shaking an infant is a highly lethal event that can lead to severe brain and spinal injury which may result in loss of consciousness, coma or death. . . . Given the high lethality of these events along with the potential for serious medical consequences, this represents a near fatality."

Despite the seriousness of this event, Mother was reluctant to contact the police and did not seek immediate medical care until urged to do so by the MGM. Mother testified she was "in shock" and "in a panic mode," but her lapse in judgment led both the social worker and Dr. Vega to express serious reservations about her protective capabilities. As Vega noted, "[a]fter witnessing her child being violently shaken and strangled by father, [Mother] did not seek immediate medical attention for [L.B.] nor did she involve law enforcement until encouraged to do so by maternal grandmother." It was unclear to Vega if Mother's actions were motivated by her desire to maintain her relationship with Father, or if she was unable to recognize the severity of the abuse inflicted on L.B. Either way, Mother then placed her son in even further danger by choosing to engage in a violent altercation with Father and attempting to take a knife out of his hand, all while holding L.B.

The evidence also revealed that L.B. had suffered at least three separate violent incidents while living with his parents. The most recent was the November 9 strangling incident that Mother witnessed. Just two days prior, L.B. sustained marks and an abrasion on and around his neck. Although Mother said she initially believed Father's explanation that the

14

injuries were self-inflicted, Dr. Vega found this implausible considering the location of the marks and the fact that L.B. was nonambulatory. Instead, Vega determined that these injuries likely arose from another strangulation event. A few days before that, L.B. suffered an inflicted injury that fractured his right wrist, for which an explanation has yet to be provided. Of these three incidents, Mother only sought medical care for L.B. after the "near fatal[ ]" strangling incident, and then only at the urging of the MGM. Mother did not seek medical care for L.B. when she saw abnormal marks and a laceration on his neck or when she saw his swollen wrist. The social worker noted that this "consistent pattern" of poor judgment extended back to Mother's pregnancy, when she declined to report that Father had kicked her in the stomach.

In addition, there was substantial evidence of Father's violent behavior and Mother's silence at the expense of her own health and safety, as well as that of L.B. and even the family dog. At various points in their relationship, Father pushed Mother up against the wall while holding her by the throat , held her down on the bed and pretended to grab her neck, and yelled at her and threw water in her face. And, as we already noted, Father's abuse continued into Mother's pregnancy. Still, Mother never told friends or family about the abuse or reported it to doctors or authorities. And the only reason the violence toward Mother stopped was because she and Father simply refused to talk about any issues. Even after the strangling incident on November 9, Mother expressed reservation about involving the police and child protective services.

We also observe that L.B. was only three months old when he came to the attention of the Agency. At the time of the contested hearing, he was approximately seven months old. At that age, he remained completely

reliant on a caregiver for his health, safety, and protection. Accordingly, that caregiver would need to be independently familiar with identifying the needs of a baby, would need to protect the baby, and would need to know when medical attention was required. Mother had, to date, not met those requirements.

Furthermore, the contested hearing was held very shortly after Mother expressed a willingness to reunite with Father once he seeks treatment. Mother had only recently begun her services and had not yet completed the child abuse classes, the domestic violence classes, or the parenting classes. As Mother herself acknowledged, she was still learning about power and control in domestic violence relationships. Along these lines, both the social worker and the court noted that Mother's testimony focused primarily on Father instead of L.B., suggesting that she remained emotionally invested in Father. Because Father and the paternal grandparents intended to remain a part of L.B.'s life, Mother's completion of services was necessary not only to provide her with insight into issues of domestic violence, but also to show that she is able to utilize the tools she has learned about to ensure L.B.'s health and safety consistent with Father's active involvement in his life. Until then, the evidence supported the concerns of the social worker, Dr. Vega, and the court that Mother would relapse into a violent relationship with Father or with another person and that she would prioritize that relationship over L.B.'s health and safety.

Mother relies on several cases to argue that the evidence did not support the juvenile court's removal order. In *In re Hailey T.* (2012) 212 Cal.App.4th 139, the Court of Appeal reversed the dispositional order removing a four-year-old minor from her parents' custody after her infant sibling was found with a nonaccidental injury to one eye. (*Id.* at p. 148.)

16

There was disputed expert testimony regarding whether the eye injury was inflicted by the parents or could have been caused by the minor. (*Ibid.*) There was also evidence to show the minor would have been capable of reporting any abuse, since she possessed good language skills, and was outgoing and social. (*Id.* at p. 147.) There was no evidence, however, that the minor was ever physically harmed in the parents' home or had suffered harm because of the abuse to her sibling. (*Id.* at pp. 147–148.) The appellate court also noted that the parents had a "healthy relationship," as there was no evidence of any domestic violence between them, and neither parent had any mental health or other issues that would put the minor at a continuing risk. (*Ibid.*) The appellate court concluded that although the record supported the court's jurisdictional findings, the record was insufficient to show a substantial risk of harm to the minor if not removed from her parents' custody under the clear and convincing standard of proof. (*Id.* at p. 148.)

We are not persuaded that *Hailey T.* requires reversal of the juvenile court's dispositional order in this case. Unlike the eye injury to a sibling that gave rise to the dependency proceedings in *Hailey T.*, L.B. was directly abused in this case, and the abuse was not an isolated incident. As Dr. Vega noted in her initial assessment and subsequent medical evaluation, L.B. had been the victim of serious physical abuse on at least three separate occasions during the first three months of his life. This included one verified strangling incident, one presumed strangling incident, and one incident resulting in a fractured wrist. In contrast with the conflicting expert testimony presented in *Hailey T.*, the undisputed record in this case shows that L.B.'s injuries could not have been self-inflicted. L.B.'s situation is also unlike that of the minor in *Hailey T.* because the evidence in the record supports a finding that L.B. *was* physically harmed in his parents' home. Mother herself witnessed

17

Father strangling and shaking L.B., and L.B.'s healing injuries suggested at least two other violent incidents in the home. While the prior strangulation incident likely occurred while in Father's care, Mother could not be definitively ruled out as the cause of the fractured wrist.

We are also unconvinced that *In re Jasmine G.* (2000) 82 Cal.App.4th 282 supports reversal. There, the juvenile court removed a teenager from the custody of her parents, both of whom had used corporal punishment as a means of discipline. (*Id.* at p. 286.) Afterward, the parents saw a private therapist, they changed their attitudes toward corporal punishment, they expressed remorse that their physical abuse led to dependency, and they completed a parenting class. (*Id.* at pp. 285–286.) At the dispositional hearing, the teenager testified that she wanted to return to her parents' house and that she had no anger toward nor fear of either parent. (*Id.* at p. 286.) The parents' therapist testified that the teenager was in no "danger" if returned to one of the parents, and the teenager's own therapist was "hesitant" about making a recommendation as to whether she should be returned home. (*Id.* at pp. 286–287.) Even so, the juvenile court ultimately removed the teenager from both parents' custody based, in large part, on the testimony of the social worker. (*Ibid.*) The social worker had testified that the parents "lack[ed] understanding of their responsibility and their roles in the incident," they were uncooperative and hostile toward her (the social worker), and they do not "have a full understanding of . . . adolescent issues." (*Ibid.*) The court itself made comments to the effect that the parents' "family values" were inconsistent with "living in 1999 in Orange County." (*Id.* at p. 287.) The appellate court reversed, concluding that a social worker's subjective belief that a parent had not " 'internalized' " parenting skills was insufficient to justify removal. (*Id.* at p. 290.) Nor was the parents' " 'lack of

18

cooperativeness and . . . hostility' " toward a social worker or their animosity toward the "juvenile justice 'system' " able to override the extensive evidence that the teenager was safe in her parents' home. (*Ibid.*) Finally, the social worker's personal opinion that corporal punishment is never appropriate— despite wide ranging views on it at the time—did not warrant removal. (*Id.* at pp. 290–291.)

Mother reads *Jasmine G.* as standing for the proposition that a social worker's opinion regarding a parent's need for additional time to engage in services will never justify removal. But there, the appellate court merely held that a social worker's opinion cannot override the weight of evidence demonstrating that a child may safely return home. (See *Jasmine G.*, *supra*, 82 Cal.App.4th at p. 289.) In this case, the social worker's testimony that Mother needed additional time to gain skills and engage in services was supported by the opinion of the child abuse pediatrician, Dr. Vega, who expressed serious reservations about Mother's protective capabilities; by the fact that Mother had only recently begun her services; and by Mother's history of failing to protect L.B. from harm and failing to seek medical treatment when she suspected injury.

Nor does *In re K.S.* (2016) 244 Cal.App.4th 327 warrant a different result. In that case, the juvenile court found clear and convincing evidence that removal was warranted under section 361, subdivision (c)(1) and (c)(3). (*Id.* at p. 341.) On appeal, the appellate court affirmed removal pursuant to subdivision (c)(3) because there was substantial evidence that the child was suffering emotional harm and there were no reasonable means to protect her without removal. At the same time, however, it struck the finding as to subdivision (c)(1) because there was no evidence that removal was necessary to protect the child's physical health. (*Id.* at p. 342.) By contrast in this case,

there was ample evidence that L.B.'s physical health and safety were at risk if he was not removed from Mother's care.

Finally, Mother's reliance on *In re A.E.* (2014) 228 Cal.App.4th 820 is also misplaced. After disciplining his toddler by striking her with a belt on one occasion, the father was ordered removed from the family home. (*Id.* at p. 825.) The appellate court reversed on the grounds that the abuse was an isolated incident, the father expressed remorse and understood that there were alternative methods of discipline, the mother testified that she would not allow the father to strike the child with a belt, the parents enjoyed a healthy relationship, and there was no evidence of domestic violence between them. (*Id.* at pp. 826–827.) In contrast, here L.B. was abused on three different occasions, at least two of those incidents were nearly fatal, Mother failed to immediately contact the police or seek medical attention after watching Father strangle and shake L.B., and Mother and Father had a history of domestic violence in their relationship.

C. *Substantial Evidence Supports the Juvenile Court's Finding of No Reasonable Alternatives to L.B.'s Removal*

In a related argument, Mother contends there were reasonable means by which L.B.'s physical health could be protected short of removing him from her custody. At the hearing, Mother requested placement with her on the condition that she reside with the MGM. The social worker testified that this would be "premature" in light of Mother's limited progress with services, and it was unrealistic to expect the MGM to monitor Mother and L.B. all day.

We disagree with Mother that *In re Henry V.* (2004) 119 Cal.App.4th 522 mandates that we reach a different conclusion. The appellate court in *Henry V.* reversed a removal order stemming from burn marks on the child's buttocks. The juvenile court premised the out-of-home placement on the serious nature of the burns and the need for the mother to complete a

bonding study. (*Id.* at p. 528.) The appellate court found these reasons insufficient, as the burn marks arose from an isolated and unexplained incident, and there was evidence that the bonding services could be provided in the home. (*Id.* at p. 529.) The court also found it inappropriate that the Agency was using the mother's right to the custody of her child as a "bargaining chip" to secure compliance with services. (*Id.* at pp. 529–530.)

Other than the seriousness of the injury, the concerns raised in *Henry V.* are not present here. That is, there is no evidence that the Agency was using L.B.'s placement as a "bargaining chip" against Mother. In fact, both the social worker and the juvenile court acknowledged Mother's progress in her services and her motivation to change. There are, however, several concerns present in this case that were missing in *Henry V.* These include the serious risk of *death* to L.B. from the November 9 strangling incident, the number and severity of the violent incidents that L.B. endured, Mother's failure to recognize L.B.'s injuries and/or seek timely medical help, her secretiveness with respect to Father's abuse, and her expressed willingness to reconcile with Father once he receives help.

Based on the foregoing, we conclude that Mother has not met her burden on appeal to demonstrate a lack of substantial evidence to support the juvenile court's dispositional findings and removal order.

## DISPOSITION

The juvenile court's order is affirmed.

DATO, J.

WE CONCUR:

AARON, Acting P. J.

IRION, J.